915 So.2d 626 (2005)
Victoria FAUSONE, Appellant,
v.
U.S. CLAIMS, INC., Appellee.
No. 2D04-2308.
District Court of Appeal of Florida, Second District.
September 14, 2005.
Rehearing Denied December 8, 2005.
Victoria Fausone, pro se.
*627 Daniel P. Rock, New Port Richey, for Appellee.
ALTENBERND, Judge.
Victoria Fausone appeals a final order granting U.S. Claims' motion to confirm an arbitration award. The arbitration occurred in Philadelphia but involved "litigation loans" extended to Ms. Fausone in Florida in exchange for an interest in her personal injury lawsuits pending in Florida. We affirm the order confirming this arbitration because Ms. Fausone presented no argument to the trial court that would permit us to deny confirmation. We explain the facts of this case in some detail because this method of litigation funding may warrant regulation in Florida. Ms. Fausone received $30,000 from U.S. Claims through a series of agreements in the fall of 2001 and now apparently owes U.S. Claims more than $102,007, plus the attorneys' fees associated with this lawsuit.

I. THE PERSONAL INJURY CLAIMS AND RESULTING LITIGATION LOANS
In May 2000, Ms. Fausone was struck by a dump truck while riding her bicycle. She retained the law firm of Florin, Roebig & Walker, P.A., to represent her in this claim and in a second unrelated products liability claim.
Beginning in October 2000, Ms. Fausone began selling interests in her lawsuits to organizations that buy such interests. These transactions are often referred to as "litigation loans,"[1] but the law does not regard them as loans because the corporation that gives money to the plaintiff has no right to recover from the plaintiff in the event that the lawsuit is unsuccessful. These transactions, however, are quite similar to any other non-recourse loan secured by an interest in any form of transferable property.
Ms. Fausone first sold an interest in her lawsuit to Advance Legal Funding, L.L.C., of Biloxi, Mississippi. She received $3000 in October 2000 and agreed to pay Advance Legal Funding, L.L.C., $6000 if she received a settlement of her claim before May 1, 2001, or $9000 plus 18% interest if a settlement occurred thereafter. Thus, the interest rate on this transaction depended on the date of repayment, but was never less than 200%.
Ms. Fausone sold a similar interest to Advance Settlement Funding, Inc., of Silver Springs, Florida. She received $2000 in exchange for a repayment schedule that increased by $150 per month with a total not to exceed $4250. The annual rate of interest on this transaction for the first year was approximately 90%.
Ms. Fausone apparently sold two more interests to Advance Settlement Funding because her obligation to them was $8075 in August 2001, and it was increasing at the rate of $375 per month.[2]
In the summer of 2001, Ms. Fausone contacted U.S. Claims seeking additional money. In fairness to U.S. Claims, it should be emphasized that there is no evidence that it solicited Ms. Fausone. *628 How or why she contacted them is not contained in the record. U.S. Claims provided more favorable terms for its litigation loans, and it helped Ms. Fausone consolidate her earlier loans. It helped her resolve the earlier loans at a significant discount.
U.S. Claims initially gave Ms. Fausone $18,000 in mid-August 2001, some of which was used to pay off the earlier loans. The purchase agreement was allegedly reviewed by Ms. Fausone's attorneys and transmitted to U.S. Claims by those lawyers. Her attorneys also provided U.S. Claims with information about her claim to assist U.S. Claims in deciding whether to advance her funds. Thereafter, Ms. Fausone returned to U.S. Claims on numerous other occasions between August 2001 and November 2002 to obtain advances in the total amount of approximately $30,000, secured by her personal injury claims.[3]

II. THE AGREEMENT
The initial advance, as well as two of the subsequent advances, are in this court's record. Each written agreement contains a paragraph that required Ms. Fausone to sign a separate document authorizing her attorneys to pay U.S. Claims from the proceeds of the claim. Her attorneys were required to sign the authorization. Darryl Levine, President of U.S. Claims, was given a power of attorney to negotiate and deposit any settlement checks that Ms. Fausone might receive in settlement of her claims.
The agreement provides that if the proceeds of the claim are less than the money owed, then U.S. Claims is entitled to 100% of the proceeds, but that if no recovery is received, Ms. Fausone will have no obligation to make any payment unless failure of recovery is due to "fraud, misrepresentation, breach of warranty or failure to perform any covenant" by Ms. Fausone or her attorney. The agreement also forbids Ms. Fausone from selling any other portion of the proceeds of her claim to any other funding sources.
The agreement contains a repayment schedule. Based on the total amount advanced of $30,000, Ms. Fausone was required to repay $42,890 before November 14, 2002. After November 14, 2002, and before February 14, 2003, the amount increased to $46,808. After February 14, 2003, and before May 14, 2003, the amount increased to $50,937. Thus, although these terms were better than the earlier agreements, the interest rate for these loans was still well above the rates normally allowed for consumer transactions.
The agreement further provides that in the event of disagreements between the parties, U.S. Claims retains the unilateral right to obtain equitable relief in either Pennsylvania or Delaware. By signing the agreement, Ms. Fausone waived her right to challenge personal jurisdiction or venue in those states. The agreement is governed and construed pursuant to the law of Delaware, except that Delaware rules concerning conflicts of law do not apply so that Ms. Fausone cannot argue that Delaware should apply the law of Florida in this case. Except for U.S. Claims' right to equitable relief, arbitration between the parties in either Pennsylvania or Delaware is the exclusive method for dispute resolution.

III. ARBITRATION
In mid-2003, U.S. Claims received notice from Ms. Fausone's attorney that her *629 personal injury claim for her bicycle accident had settled for an amount in excess of $200,000 but that she had instructed him not to remit repayment to U.S. Claims. U.S. Claims sought to collect on the debt owed by Ms. Fausone, which, in accordance with the repayment schedule, totaled $50,937 at that time.[4] Because Ms. Fausone refused to repay U.S. Claims, it initiated arbitration with the American Arbitration Association in Philadelphia. Approximately two months later, Ms. Fausone filed a petition for declaratory judgment in Florida, arguing that the terms of her agreement with U.S. Claims were unconscionable, that she was being charged usurious interest, and that she should not be compelled to arbitrate.
U.S. Claims filed a motion to dismiss or abate the Florida action pending arbitration. The trial court entered an order staying the claim pending arbitration. The case went to arbitration in February 2004 in Philadelphia. Ms. Fausone was offered the opportunity to appear by telephone, but she did not participate in the arbitration. U.S. Claims was awarded $72,117.[5] Ms. Fausone then filed a motion in the Florida action to vacate the arbitration award, and U.S. Claims responded by filing a motion to confirm the award. A hearing was conducted on the motions in April 2004, at which time Ms. Fausone decided not to proceed with her motion to vacate. The trial court then entered an order granting U.S. Claims' motion to confirm the arbitration award.
It is noteworthy that Ms. Fausone has not been assisted by a lawyer in the arbitration proceeding, in the action for declaratory relief, or in this appeal. Throughout these proceedings, the documents reflect that she has been assisted by a nonlawyer, Joyce L. Potkay of "Cheaper than a Lawyer" in Holiday, Florida. Ms. Potkay may be cheaper than a lawyer, but she certainly has been no substitute for one.

IV. THIS APPEAL
Because Ms. Fausone withdrew her motion to vacate the arbitration award, there are few, if any, preserved issues for appeal. See § 682.12, Fla. Stat. (2004) (providing that a court shall confirm an arbitration award unless a motion to vacate or modify the award is pending). She has not demonstrated that the purchase agreements could be invalidated by a Florida court. There appear to be no laws regulating such agreements in Florida. They are not treated like consumer loans. Accordingly, we must affirm the judgment on appeal and grant U.S. Claims' motion for attorneys' fees pursuant to the purchase agreement.

V. A POSSIBLE NEED FOR REGULATION
The Florida Bar has issued an Ethics Opinion ruling that a lawyer may provide a client with information about companies like U.S. Claims and may provide factual *630 information to those companies with the consent of the client. The lawyer may honor the written assignment of claim but may not issue a letter of protection to the funding company. See Prof'l Ethics of the Florida Bar, Op. 00-3 (2002). Although lawyers may take these actions, the literature concerning litigation loans provides divergent views of their merit. See Kenneth L. Jorgensen, Presettlement Funding Agreements: Benefit or Burden, 61 Bench & B. Minn. 14 (2004); Andrew Hananel & David Staubitz, The Ethics of Law Loans in the post-Rancman Era, 17 Geo. J. Legal Ethics 795 (2004); Terry Carter, Cash Up Front, 90 A.B.A.J. 34 (2004); Douglas R. Richmond, Other People's Money: The Ethics of Litigation Funding, 56 Mercer L.Rev. 649 (2005).
A person who suffers a severe personal injury will often need money to care for herself and her family during the pendency of litigation. Lawsuits take time and come with few guarantees. Grocery stores and home mortgage lenders do not wait for payment merely because a person is unable to work due to an automobile accident or other injury. Thus, it cannot be denied that people like Ms. Fausone may need a credit source during litigation.
On the other hand, a person who is the victim of an accident should not be further victimized by loan companies charging interest rates that are higher than the risks associated with the transaction.[6] We emphasize that the record does not reflect the value of Ms. Fausone's claim when U.S. Claims negotiated with her, but a company that only loaned money when it was secured by high-grade personal injury claims would seem to be able to charge a lower interest rate than some of the rates described in this opinion, even when the arrangement is a nonrecourse loan.
The purchase agreement in this case is one-sided and designed to prevent a Florida citizen from having access to a local court or another local dispute resolution forum. Such agreements create confusion concerning the party who actually owns and controls the lawsuit, and create risks that the attorney-client privilege will be waived unintentionally.
This court has no authority to regulate these agreements. However, if The Florida Bar is going to allow lawyers to promote and provide such agreements to their clients, it would seem that the legislature might wish to examine this industry to determine whether Florida's citizens are in need of any statutory protection.
Affirmed.
WHATLEY and SALCINES, JJ., Concur.
NOTES
[1] A search for "litigation loan" on the internet will rapidly produce the websites of various organizations willing to buy a portion of a plaintiff's claim. The literature also uses the terms "litigation finance," "injury funds," "cash advance settlements," "advance settlement funding," "lawyer funding," or "pre-settlement advance" to describe these transactions. See Yifat Shaltiel & John Cofresi, Litigation Lending for Personal Needs Act: A Regulatory Framework to Legitimatize Third Party Litigation Finance, 58 Consumer Fin. L.Q. Rep. 347 (2004).
[2] These facts are based on the finding in the arbitration decision issued in the dispute between Ms. Fausone and U.S. Claims.
[3] There is some factual dispute in the record regarding the number of advances Ms. Fausone received and against which claim or claims they were advanced. However, these factual discrepancies are not germane to the decision we reach today.
[4] Ms. Fausone's attorney had retained $50,937 in escrow and filed a motion for permission to deposit the money with the court, which was granted by the trial court in December 2003.
[5] According to the repayment schedule contained in the initial and amended agreements, this is the amount Ms. Fausone would be required to pay U.S. Claims if her payment was made after February 14, 2004, and before May 14, 2004. Although this was the amount awarded after arbitration, the arbitration award provided that if Ms. Fausone failed to pay by May 14, 2004, the amount owed would continue to increase in accordance with the payment schedule contained in the initial and amended agreements. After February 14, 2005, the amount increased to $102,007. It is unclear from the record whether this amount has continued to increase during the term of the arbitration and litigation.
[6] Especially if lawyers establish litigation loan companies to "service" one another's clients, these high interest loans may actually be a method to increase the lawyers' contingency fees. Other issues may arise if such litigation loans are used to pay costs during litigation.